O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| QUEST SOFTWARE, INC., | ) | CASE NO. SACV 09-1232 AG (ANx) |
| | ) | |
| Plaintiff, | ) | ORDER RE DEFENDANT'S |
| | ) | MOTIONS FOR PARTIAL SUMMARY |
| v. | ) | JUDGMENT |
| | ) | |
| DIRECTV OPERATIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Quest Software, Inc. ("Plaintiff") licensed its Foglight computer software to Defendant DirecTV Operations, LLC ("Defendant") in 2002. Plaintiff sued Defendant in 2009 for deploying this software in alleged violation Plaintiff's copyrights and the parties' license agreements. Defendant now files two Motions for Partial Summary Judgment (the "Motions"), the first on Plaintiff's claims for copyright infringement and breach of contract, and the second on damages. After considering all arguments and papers submitted, the Courts GRANTS in part and DENIES in part Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for copyright infringement and breach of contract ("First Motion"). The Court GRANTS in full Defendant's Motion for Partial Summary Judgment on damages ("Second Motion").

**BACKGROUND**

Defendant provides satellite television to nearly 20 million customers in the United States. (First Motion at 2:17-18.) Plaintiff creates and licenses computer systems management software, including a line of software named Foglight. (Complaint ("Compl.") ¶ 5.) Foglight allows users to detect, diagnose, and fix certain problems in computer systems. (*Id*. ¶ 7.) Defendant used Foglight primarily to monitor the performance of computer servers supporting its customer service call centers. (First Motion at 2:15-18.) Foglight software has nothing to do with Defendant's satellite television service. (*Id.*)

In 2002, the parties signed a software license agreement ("License Agreement") allowing Defendant to use certain Foglight software. (*Id.* ¶¶ 10-12.) The License Agreement consisted of two parts – a standard form software license agreement and a customized addendum ("Addendum") modifying many of the standard terms (Defendant's Statement of Uncontroverted Facts and Law in Support of its Second Motion ("UF2") ¶ 3.) The License Agreement allowed Defendant to use Foglight on its Windows NT servers only. The License Agreement also limited Defendant's use of Foglight to a certain number of central processing units ("CPUs"). (Defendant's Statement of Uncontroverted Facts and Law in Support of its First Motion ("UF1") ¶ 4.)

Plaintiff alleges that Defendant "overdeployed" Foglight by using it on more CPUs than the License Agreement permitted. (UF1 ¶¶ 48-49.) Under the terms of the License Agreement, overdeployment does not constitute an automatic breach. In fact, the License Agreement permits Defendant to overdeploy Foglight provided that Defendant later pays Plaintiff for using the software on additional CPUs. This payment is referred to as the "true-up" payment. (*Id.*)

Sometime in 2005, Defendant decided to shift its call center CPUs from Windows NT servers to AIX servers. (UF1 ¶ 8.) Hewlett Packard ("HP"), Defendant's server administrator, told Plaintiff that the migration to AIX servers would begin in June 2006 and end in June 2007. (UF1 ¶ 9.) The parties dispute whether, and to what extent, Plaintiff knew and approved of Defendant's use of Foglight on the new AIX servers. Indeed, Defendant's Motions turn

primarily on (1) whether Plaintiff knew and approved of Defendant's use of Foglight on AIX servers, and (2) whether Plaintiff knew how many of Defendant's servers were running Foglight. In any event, Plaintiff continued to provide support services to Defendant after Foglight was installed on its AIX servers. (UF1 ¶¶ 17-23.)

In June 2007, Plaintiff requested information from Defendant concerning its computer systems. At Defendant's direction, HP created data reports (the "June 2007 Reports") and sent them to Plaintiff. The June 2007 Reports purported to show the number and type of servers running Foglight software. (UF1 ¶¶ 32-33.) Although the parties dispute the accuracy of the June 2007 Reports, there is no dispute Plaintiff could not have been ignorant of Defendant's overdeployment after receiving them. (Plaintiff's Opposition to Defendant's First Motion ("Opp'n") at 4:7-8.)

In late 2008, Plaintiff sent Defendant an invoice that included (1) true-up fees for the overdeployed licenses; (2) "retroactive" maintenance fees for the overdeployed licenses; and (3) maintenance fees for 2009. (Second Motion at 3:21:25.) Defendant refused to pay the invoice and Plaintiff filed suit.

Based on these facts and others, Plaintiff asserts claims against Defendant for copyright infringement and breach of contract. Defendant now files two Motions for Partial Summary Judgment – one on Plaintiff's claims for copyright infringement and breach of contract and the other concerning damages.

**PRELIMINARY MATTERS**

The parties submitted numerous evidentiary objections. In motions with numerous objections, "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Doe v. Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).

The Court has reviewed the parties' objections and relies only on admissible evidence. *See F.T.C. v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1118 n.5 (S.D. Cal. 2008) ("The parties have

each filed evidentiary objections. However, in deciding the present motions, the Court has only relied upon admissible evidence."); *See also Schroeder v. San Diego Unified School Dist.*, Case No. 07-266, 2009 WL 1357414, at *2, n.1 (S.D. Cal. May 13, 2009).

**LEGAL STANDARD**

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If, and only if, the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322-23. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

**ANALYSIS**

The Court first considers Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for copyright infringement and breach of contract. The Court then considers Defendant's Motion for Partial Summary Judgment on maintenance fees damages.

**1. PLAINTIFF'S FIRST CLAIM, FOR COPYRIGHT INFRINGEMENT**

Plaintiff alleges that Defendant infringed its registered Foglight copyrights, in violation of the Copyright Act, 17 U.S.C. Section 101 *et seq.* (Compl. ¶ 28.) Plaintiff bases this claim on two theories: (1) that Defendant improperly used Foglight software on CPUs with AIX servers, and (2) that Defendant used Foglight on more CPUs than the License Agreement permitted (*Id.* ¶¶ 16, 20, 27.) Plaintiff also claims that Defendant infringed its copyrights by altering the Foglight software. (Opposition to Defendant's First Motion ("Opp'n") at 9:8-10:27.) The Court considers these arguments in turn.

**1.1 Use of Foglight Software on AIX Servers**

In its Complaint, Plaintiff alleges that Defendant violated its Foglight copyrights by copying Foglight onto AIX servers without Plaintiff's authorization. (Compl. ¶ 31.) Defendant argues that using Foglight on its AIX servers did not violate Plaintiff's copyrights because Plaintiff impliedly licensed Defendant to do so. (UF1 ¶ 15.) The Court agrees with Defendant.

"The existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). A nonexclusive license, like the one in this case, may be granted expressly or impliedly through conduct. *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990). An implied license may be found where conduct by the copyright holder leads another party to believe that they may use the copyright. *See Field v. Google, Inc.*, 412 F. Supp. 2d. 1106, 1116 (D. Nev. 2006) (citing *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)).

An implied license to use copyrighted software exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute [the] work" or "use, retain and modify the programs." *Asset*

5

*Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (footnote and internal quotation marks omitted).

Here, the first requirement is satisfied because Defendant paid Plaintiff to adapt Foglight to AIX servers supporting Defendant's call centers. (UF1 ¶¶ 17-20, 24-26, 37.) The second requirement is also met because Plaintiff delivered Foglight to Defendant and uploaded it to the AIX servers. (*Id.* ¶ 23.) And the third requirement is satisfied because Plaintiff permitted Defendant to use Foglight on AIX servers. The March 2007 Statement of Work signed by the parties provided that Defendant would "[d]eploy Foglight . . . on as many AIX servers as possible . . . " (*Id.* ¶ 25.) The efforts of Plaintiff's consultants to load Foglight on the AIX servers further demonstrate that Plaintiff not only knew of Defendant's use Foglight on the AIX servers, but intended Defendant to use Foglight in this manner. (*Id.* ¶ 26.)

### 1.2 Overdeployment of Foglight Software

Plaintiff also argues that Defendant violated its Foglight copyrights by running Foglight software on more CPUs than the License Agreement allowed. This argument fails because it states a claim for contract breach, not for copyright infringement.

"Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) (internal quotation marks omitted). A licensee may sue for copyright infringement only when the licensee acts outside the scope of the license. *Id.* (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d at 1081, 1087 (9th Cir. 1989).

To prove that a licensee acted outside the scope of a license, the licensor "must demonstrate that the violated term . . . is a condition rather than a covenant" under state contract law and federal copyright law. *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 2011 U.S. App. LEXIS 3428, at *15 (9th Cir. Feb 14. 2011). Stated somewhat circularly, conditions are "contractual terms that limit a license's scope . . . the breach of which constitute[s] copyright

6

1  infringement." *Id.* at *16. All other license terms are "covenants," which the Ninth Circuit has
2  defined to mean a "contractual promise, i.e., a manifestation or intention to act or refrain from
3  acting in a particular way." *Id*. (citing Restatement (Second) of Contracts § 2 (1981)).
4      Here, the overdeployment and true-up provisions in the License Agreement permit
5  Defendant to use Foglight on additional CPUs for an extra fee. These provisions are properly
6  described as covenants because they do not concern the scope of the license, only the number of
7  CPUs the license covers. *See, e.g., BroadVision, Inc. v. Medical Protective Co.*, 2010 U.S. Dist.
8  LEXIS 131106 (S.D.N.Y. Nov. 23, 2010) (applying California law to find that the license
9  provisions permitting excess use of software in exchange for higher fees are covenants, not
10 conditions.) Because the provision restricting the number of CPUs on which Foglight can run is
11 a covenant, its breach provides Plaintiff no grounds to claim that Defendant infringed its
12 copyright.

14     **1.3    Alteration of Foglight Software**

16     In its Opposition, Plaintiff argues for the first time that Defendant infringed its Foglight
17 copyrights by altering the Foglight software. (Opp'n at 9:11-27.) Plaintiff contends that its
18 copyright claims must survive Defendant's First Motion because "questions remain as to
19 whether DirecTV itself made changes to the Foglight software beyond those authorized and
20 performed by Quest . . . ." (UF1 ¶¶ 20, 54, 55.) Plaintiff also states that questions of fact exist
21 as to whether the customization work performed by HP, Defendant's agent, constituted
22 copyright infringement. (Opp'n to First Motion at 9:27-10:1.)
23     Plaintiff's argument fails because it is factually unsupported and procedurally improper.
24 To support its contention that Defendant impermissibly altered the Foglight software, Plaintiff
25 cites several lines of deposition testimony from Defendant's employee who used to work for HP
26 and three paragraphs from Defendant's Statement of Uncontroverted Facts and Law. (*Id.* at
27 9:25-27.) First, Defendant's employee's testimony does nothing to establish that Defendant or
28 HP altered the Foglight software. (Declaration of William J. Kolegraff in Support of

7

Defendant's Reply to Plaintiff's Opp'n at Ex A.; UF1 ¶¶ 20, 54, 55.) It only suggests that HP was *capable* of making such changes. (*Id.*)

Likewise, Plaintiff's references to Defendant's uncontroverted facts prove nothing. Those facts establish that Plaintiff's consultant "traveled to HP's facilities multiple times . . . to install and customize the Foglight software on DIRECTV's AIX servers . . . " (UF1 ¶ 20.) But this demonstrates that Plaintiff's agent, not Defendant, modified the Foglight software. Other undisputed facts indicate that Plaintiff helped Defendant install, troubleshoot, and customize Foglight. (*Id.* ¶¶ 54, 55.) They provide no support for Plaintiff's claim that Defendant made impermissible modifications to its software.

Plaintiff's argument also fails because it is procedurally improper. Plaintiff did not plead this theory of liability in its Complaint. Nor did Plaintiff raise this argument in its Rule 26(f) disclosure or at anytime during discovery. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000) ("[A]dding a new theory of liability at the summary judgment stage would prejudice the defendant who faces different burdens and defenses under a second theory of liability." (citations omitted)). The Court will not permit Plaintiff to raise this theory of liability for the first time in its Opposition to Defendant's First Motion.

**1.4    Conclusion**

There is no genuine issue of material fact concerning Plaintiff's claim for copyright infringement. Thus, the Court GRANTS Defendant's First Motion on Plaintiff's first claim.

**2.    PLAINTIFF'S SECOND CLAIM, FOR BREACH OF CONTRACT**

Plaintiff alleges that Defendant breached the License Agreements by (1) overdeploying its licenses of Foglight software and (2) using Foglight on the AIX servers. (Comp. ¶ 41.) Defendant does not move for summary judgment on the basis that it never overdeployed Foglight software. In its First Motion, Defendant instead argues that equitable estoppel bars

Plaintiff from asserting that Defendant breached the License Agreement. Before turning to the parties' specific claims, the Court first examines the doctrine of equitable estoppel.

**2.1     Equitable Estoppel**

Four elements are necessary to establish equitable estoppel:
> (1) the party to be estopped must know the facts (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*U.S. v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988) (citing *Bob's Big Boy Family Restaurants v. N.L.R.B.*, 625 F.2d 850, 854 (9th Cir. 1980)). In other words, a plaintiff will be estopped from asserting a breach of contract claim if he aids or induces a breach. *See Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006).

Here, for its equitable estoppel defense to succeed, Defendant must prove the following: (1) that Plaintiff knew Defendant was using Foglight software on AIX servers or overdeploying Foglight; (2) that Plaintiff's actions or omissions led Defendant to believe that Plaintiff did not intend to enforce its rights under the License Agreement; (3) that Defendant was unaware that Plaintiff objected to its use of Foglight software on AIX servers or its overdeployment of Foglight; and (4) that Defendant detrimentally relied on Plaintiff's actions or omissions.

The parties' arguments concerning equitable estoppel resemble two ships passing in the night. Defendant forcefully argues that equitable estoppel bars Plaintiff from claiming that Defendant beached the License Agreement by *using Foglight on the AIX servers*, but says little about overdeployment. Plaintiff, on the other hand, largely ignores the AIX servers. Instead, Plaintiff focuses on arguing that equitable estoppel does not bar its claim that Defendant breached the License Agreement by *overdeploying Foglight software*.

The Court now will now bring these ships to safe harbor.

**2.2 Using Foglight on the AIX Servers**

To support its equitable estoppel defense, Defendant claims that Quest "helped [it] install Foglight on the AIX servers" and "led [it] to believe it did not object to that use, or require any payment for such use." (First Motion at 13:15-19.) Defendant also claims that it relied, to its detriment, on Plaintiff's actions when deciding to install Foglight on the AIX servers. *Id.* Thus, Defendant concludes that equitable estoppel bars Plaintiff breach of contract claim as to Defendant's use of Foglight on AIX servers. The Court agrees.

**2.2.1 Whether Plaintiff Knew of Defendant's Use of Foglight Software on AIX Servers**

To satisfy the first element of the equitable estoppel test, Defendant must prove that Plaintiff knew Defendant was using Foglight software on AIX servers. The facts demonstrate that Plaintiff helped Defendant "install and customize Foglight on AIX servers." (UF1 ¶ 54.) Plaintiff does not dispute that it was aware that Defendant used Foglight on AIX servers. Accordingly, the Court finds this element to be satisfied.

**2.2.2 Whether Plaintiff's Actions or Omissions Demonstrated That it Did Not Intend to Enforce its Contract Rights**

To satisfy the second element, Defendant must prove that Plaintiff led it to believe that Plaintiff would not enforce its contract rights to prevent Defendant from using Foglight on the AIX servers. Defendant claims that "Quest's actions and lack of objection led DIRECTV reasonably to believe it had permission to use Foglight on the AIX servers . . . ." (First Motion at 15:21-23.) As noted, Plaintiff helped Defendant customize Foglight for AIX servers. Plaintiff also sent consultants to teach Defendant how to operate Foglight software on AIX servers,

without ever telling Defendant that it was unlicensed to use Foglight software on AIX servers or demanding license fees for such use. (*Id.* at 15:27-28.)

Plaintiff fails to present adequate proof that its actions did not lead Defendant to believe that it had permission to run Foglight on AIX servers. The Court finds this element to be satisfied.

### 2.2.3. Whether Defendant was Ignorant of Plaintiff's Objections

To satisfy the third element, Defendant must prove that it was unaware that Plaintiff objected to its use of Foglight on AIX servers. Defendant claims that it was unaware of Plaintiff's objection for the same reasons identified in Section 2.2.2. For example, Defendant claims that Plaintiff's actions – "teaching DIRECTV how to install Foglight on the machines" and "working with DIRECTV to overcome problems" – led Defendant to believe that Plaintiff had no objection to its use of Foglight on AIX servers. (First Motion at 16:20-23.)

As before, Plaintiff provides insufficient evidence to support a claim that Defendant was aware that it objected to Defendant's use of Foglight software on AIX servers. The Court finds this element to be satisfied.

### 2.2.4. Whether Defendant Relied to Its Detriment

To satisfy the fourth element, Defendant must prove that it relied to its detriment on Plaintiff's silence. Defendant claims that it would not have used Foglight on AIX servers if it had known that Plaintiff would claim fees. (Motion at 17:14-16.) The Court finds, and Plaintiff does not effectively dispute, that Defendant has satisfied this element.

### 2.2.5. Conclusion

The Court has reviewed Plaintiff's other arguments, and finds them unpersuasive. Defendant has demonstrated that equitable estoppel bars Plaintiff's breach of contract claim as to Defendant's use of Foglight software on AIX servers. Thus, the Court GRANTS Defendant's Motion for Partial Summary Judgment on Plaintiff's breach of contract claims for the unauthorized use of Foglight on AIX servers.

### 2.3  Overdeploying Foglight Software

As noted, Defendant dedicates most of his First Motion to arguments concerning AIX servers, and gives much less attention to the issue of overdeployment. Because Defendant does not come close to satisfying all four equitable estoppel factors on this issue, Plaintiff's breach of contract claim based on Defendant's alleged overdeployment survives summary judgment.

### 2.3.1  Whether Plaintiff Knew of Defendant's Overdeployment of Foglight

Plaintiff argues that it was not aware of Defendant's overdeployment of Foglight until June 2007, when HP provided results of an audit of Defendant's computer systems to Plaintiff. (Opp'n to First Motion at 3:21-4:7.)  Defendant disputes this fact, arguing that Plaintiff knew Defendant was overdeployed before June 2007. (UF1 ¶ 58.)

Defendant presents insufficient evidence to support its claim that Plaintiff was aware of the overdeployment before June 2007. Defendant claims that in March 2007, Plaintiff created a Statement of Work instructing its agents to "[d]eploy Foglight [software] . . . on as many AIX servers as possible within the allocated amount of time." (Motion at 15:12-13.)  But Defendant does not explain how this statement proves that Plaintiff knew about the overdeployment. Indeed, this statement means only what it says – that Plaintiff intended to deploy Foglight software on as many of AIX servers as possible in a limited period of time. It doesn't imply,

much less prove, that Defendant intended to install Foglight software on more CPUs than the License Agreement permitted.

Defendant also claims that Plaintiff had "estimates" of Defendant's pre-June 2007 deployment of Foglight. (Reply at 10:14-15.) Defendant claims, for example, that in April 2006, it informed Plaintiff of its plans to use Foglight on 192 AIX servers. (*Id.* at 10:16.) This argument is flawed. First, mere estimates do not provide a sufficient basis to establish that Plaintiff's *knew* Defendant was overdelployed. Second, Defendant does not provide evidence demonstrating that 192 servers constitutes an overdeployment.

Defendant further claims that in July 2006 one of Plaintiff's employees attempted to bill Defendant to deploy Foglight on 550 AIX servers. Even if true, this does not come close to proving that no genuine issue of material fact exists concerning overdeployment.

Because Defendant has not proven that Plaintiff was aware of any overdeployment, at least before June 2007, its equitable estoppel defense fails on this point. When Plaintiff became aware of Defendant's purported overdeployment is a genuine issue of material fact. Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment on Plaintiff's claim for breach of contract for overdeployment of Foglight software.

### 2.3.2   Whether Plaintiff's Actions or Omissions Demonstrated That It Did Not Intend to Enforce Its Contract Rights

Even if Defendant could prove that Plaintiff knew of the overdeployment, its equitable estoppel defense would fail because an issue of fact exists concerning whether Plaintiff intended to enforce its contract rights. Defendant claims that Plaintiff did not intend to charge Plaintiff for any overdeployment, but the terms of the License Agreement indicate otherwise.

The License Agreement specifically addresses the issue of payment in cases of overdeployment. Under the terms of the License Agreement, Defendant had the "right to increase the aggregate number of CPU's . . . by up to 10% per product . . . at no additional fee."

1  (First Motion at 4:1-9.) Defendant could exceed this 10% threshold on the condition that it paid
2  Plaintiff additional license fees. (*Id.*)
3   Plaintiff argues that the existence of this true-up provision is one of the reasons why it did
4  not immediately seek overdeployment fees from Defendant. Whatever the merits of this claim, it
5  raises an issue of fact that the Court cannot decide on summary judgment.

### 2.3.3 Conclusion

The Court has considered Defendant's other arguments, and finds them unpersuasive. Because genuine issues of fact exist concerning Plaintiff's knowledge of Defendant's overdeployment and Plaintiff's willingness to enforce its contract rights, the Court need not consider factors three and four of the equitable estoppel test. Equitable estoppel does not bar Plaintiff from claiming that Defendant's purported overdeployment constituted a breach of the License Agreement. Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment on Plaintiff's claim for breach of contract based on overdeployment.

### 3.   PLAINTIFF'S CLAIM FOR MAINTENANCE SERVICE FEE DAMAGES

Plaintiff alleges that Defendant breached the License Agreement by failing to pay maintenance service fees. (Compl. ¶¶ 24-26, 42.) Defendant argues that the License Agreement doesn't require it to pay the maintenance fees Plaintiff seeks to recover. The Court first considers Plaintiff's claim for maintenance fee damages for 2009. It then turns to Plaintiff's claim for "retroactive" maintenance fees. Finally, the Court discusses the quasi-contract argument Plaintiff raises for the first time in its Opposition to Defendant's Second Motion.

**3.1 Plaintiff's Claim for Maintenance Fee Damages For 2009**

Plaintiff alleges that Defendant breached the License Agreement by failing to pay software maintenance fees to Plaintiff for first quarter of 2009. (Compl. ¶¶ 24-26, 42.) Defendant argues that it was not obligated to pay software maintenance fees in 2009 because it properly canceled the maintenance services agreement. (Second Motion at 5:8-10.) The Court agrees with Defendant.

As noted, the parties entered into two agreements in 2002. First, the parties signed a standard form software license agreement. One week later, the parties negotiated an Addendum, which modified the terms of the standard form. Together, these agreements constitute the License Agreement. Section 10 of the License Agreement governs "Maintenance And Other Services." Under that section, "Maintenance Periods" begin on the date of the first invoice mailed by Plaintiff and end 12 months later. (*Id.*) Section 10 also provides that:

> Each Maintenance Period shall automatically renew for another twelve (12) months unless the renewal has been cancelled by either party's giving written notice at least sixty (60) days prior to that first day of the renewal Maintenance Period. *Licensee's failure to make payment on a maintenance renewal invoice shall constitute Licensee's cancellation of Maintenance Services.*

(*Id.*) (emphasis added).

Although Section 10 is not a model of clarity, its language permits Defendant, as licensee, to cancel maintenance services simply by failing to make payment on a maintenance renewal invoice. In December 2008, Plaintiff sent an invoice requesting renewal of maintenance services for 2009. (Second Motion, Ex. F.) By not paying the bill, Defendant effectively canceled maintenance services. (UF2 ¶ 8.)

Plaintiff admits that the License Agreement modified by the Addendum permitted Defendant to discontinue maintenance services by not paying the renewal invoice. Plaintiff also admits that Defendant declined to renew the maintenance contract when it expired at the end of

15

2008. Thus, there is no genuine issue of material fact concerning Defendant's contractual obligation to pay maintenance fees in 2009.

**3.2     Plaintiff's Claim for Retroactive Maintenance Fees**

Plaintiff also alleges that Defendant owes "retroactive" maintenance fees on the licenses it overdeployed. (Compl. ¶¶ 24-26, 42.) Defendant argues that Plaintiff cannot recover "retroactive" maintenance fees because the true-up provision in the License Agreement never mentions them. (Second Motion at 5:8-10.) Again, the Court agrees with Defendant.

As noted, overdeployment does not constitute an automatic breach of the License Agreement. In fact, the License Agreement provides specific procedures to follow in cases of overdeployment. Under the terms of the License Agreement, a licensee can remedy overdeployment simply by paying the licensor for the extra licenses. The true-up provision in Paragraph 16 of the License Agreement provides that:

> If the Licensee's use of the Software is found to be greater than contracted for, Licensee will be invoiced for the additional licenses or license upgrades (based on the applicable units of measure, e.g., servers, server tiers, or users) and the license fees shall be payable in accordance with this Agreement.

(Second Motion, Ex. F.) Significantly, the true-up provision does not require payment of maintenance fees in cases of overdeployment.

Still, Plaintiff claims that the true-up provision requires payment of maintenance fees as well. For example, Plaintiff states that "even if the overdeployment itself did not constitute a breach of the agreement, DirecTV's subsequent refusal to provide compensation to Quest for the unauthorized licenses *and associated maintenance benefits* enjoyed by those licenses did constitute a breach . . . ." (Opp'n to Second Motion at 7:22-28 (emphasis added).) Plaintiff also claims that the true-up mechanism contemplated payment for "unauthorized licenses *and maintenance thereon*." (*Id.* at 4:21-27 (emphasis added).)

16

Plaintiff's arguments cannot overcome the plain language of the License Agreement. Defendant is required to pay licenses fees, not maintenance costs, on overdeployed Foglight software. Because the License Agreement does not require Defendant to pay retroactive maintenance fees when overdeployment occurs, Plaintiff's claim for retroactive maintenance fee damages fails as a matter of law.

**3.3    Quasi-Contract**

After arguing the merits of its contract claims for maintenance fee damages, Plaintiff asks the court to consider "quasi-contractual theories of recovery as well." (Opp'n to Second Motion at 9:1-28.) Plaintiff did not allege these theories in its Complaint or raise them during discovery. So Plaintiff asks the Court to treat Defendant's Motion as a Rule 12(c) motion for judgment on the pleadings and permit Plaintiff "to amend its complaint to state a claim for restitution based on quantum meruit." (*Id.*)

The Court need not address the merits of Plaintiff's quantum meruit argument because its request to amend its pleadings, coming nearly two years after filing suit and less than one month before trial, is untimely. In its April 2010 Scheduling Order, the Court gave the parties 90 days to amend their pleadings, explaining that post-deadline amendment would be permitted only under "exceptional circumstances." (Dkt. No. 27.)

Federal Rule of Civil Rule 16(b) requires a showing of "good cause" when a party seeks to amend its pleading after the deadline established in a scheduling order. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000.) If the party seeking the amendment "was not diligent, the inquiry should end." *Id*. Here, Plaintiff has not been sufficiently diligent.

### 3.4 Conclusion

The Court has considered Plaintiff's other arguments, and finds them unpersuasive. Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for damages for unpaid maintenance fees is GRANTED in full.

**DISPOSITION**

The Court thoroughly reviewed the parties' papers and issued a Tentative Order. At the hearing on the Tentative Order, additional arguments were presented. But there has not been a Rule 56(d) motion and the Court feels impelled to based its Order on the papers submitted.

Defendant's First Motion for Partial Summary Judgment is GRANTED as to Plaintiff's claim for copyright infringement. Defendant's First Motion for Partial Summary Judgment is GRANTED in part and DENIED in part as to Plaintiff's claim for breach of contract. Equitable estoppel bars Plaintiff from claiming that Defendant breached the License Agreement by using Foglight on the AIX servers. But equitable estoppel does not bar Plaintiff from claiming that Defendant breached the License Agreement by overdeploying the Foglight software. Defendant's Second Motion for Partial Summary Judgment on Plaintiff's claims seeking recovery for maintenance fee damages is GRANTED in full.

IT IS SO ORDERED.

DATED: September 26, 2011

_____
Andrew J. Guilford
United States District Judge