1

2

3

4                                                  O

5

6

7                    UNITED  STATES  DISTRICT  COURT

8               FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

9

10   QUEST SOFTWARE, INC.,              )    CASE NO. SACV 09-1232 AG (ANx)
                                        )
11                                      )
                        Plaintiff,      )    ORDER RE DEFENDANT'S
12                                      )    MOTIONS FOR PARTIAL SUMMARY
            v.                          )    JUDGMENT
13                                      )
                                        )
14   DIRECTV OPERATIONS, LLC,           )
                                        )
15                                      )
                        Defendant.      )
16                                      )
     _____   )
17

18

19        Plaintiff Quest Software, Inc. ("Plaintiff") licensed its Foglight computer software to

20   Defendant DirecTV Operations, LLC ("Defendant") in 2002.  Plaintiff sued Defendant in 2009

21   for deploying this software in alleged violation Plaintiff's copyrights and the parties' license

22   agreements.  Defendant now files two Motions for Partial Summary Judgment (the "Motions"),

23   the first on Plaintiff's claims for copyright infringement and breach of contract, and the second

24   on damages.  After considering all arguments and papers submitted, the Courts GRANTS in part

25   and DENIES in part Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for

26   copyright infringement and breach of contract ("First Motion").  The Court GRANTS in full

27   Defendant's Motion for Partial Summary Judgment on damages ("Second Motion").

28

1 | **BACKGROUND**

2

3      Defendant provides satellite television to nearly 20 million customers in the United

4 States.  (First Motion at 2:17-18.)  Plaintiff creates and licenses computer systems management

5 software, including a line of software named Foglight.  (Complaint ("Compl.") ¶ 5.)  Foglight

6 allows users to detect, diagnose, and fix certain problems in computer systems.  (*Id*. ¶ 7.)

7 Defendant used Foglight primarily to monitor the performance of computer servers supporting

8 its customer service call centers.  (First Motion at 2:15-18.)  Foglight software has nothing to do

9 with Defendant's satellite television service.  (*Id.*)

10      In 2002, the parties signed a software license agreement ("License Agreement") allowing

11 Defendant to use certain Foglight software.  (*Id.* ¶¶ 10-12.)  The License Agreement consisted of

12 two parts – a standard form software license agreement and a customized addendum

13 ("Addendum") modifying many of the standard terms (Defendant's Statement of Uncontroverted

14 Facts and Law in Support of its Second Motion ("UF2") ¶ 3.)  The License Agreement allowed

15 Defendant to use Foglight on its Windows NT servers only.  The License Agreement also

16 limited Defendant's use of Foglight to a certain number of central processing units ("CPUs").

17 (Defendant's Statement of Uncontroverted Facts and Law in Support of its First Motion ("UF1")

18 ¶ 4.)

19      Plaintiff alleges that Defendant "overdeployed" Foglight by using it on more CPUs than

20 the License Agreement permitted.  (UF1 ¶¶ 48-49.)  Under the terms of the License Agreement,

21 overdeployment does not constitute an automatic breach.  In fact, the License Agreement permits

22 Defendant to overdeploy Foglight provided that Defendant later pays Plaintiff for using the

23 software on additional CPUs.  This payment is referred to as the "true-up" payment.  (*Id.*)

24      Sometime in 2005, Defendant decided to shift its call center CPUs from Windows NT

25 servers to AIX servers.  (UF1 ¶ 8.)  Hewlett Packard ("HP"), Defendant's server administrator,

26 told Plaintiff that the migration to AIX servers would begin in June 2006 and end in June 2007.

27 (UF1 ¶ 9.)  The parties dispute whether, and to what extent, Plaintiff knew and approved of

28 Defendant's use of Foglight on the new AIX servers.  Indeed, Defendant's Motions turn

2

1 | primarily on (1) whether Plaintiff knew and approved of Defendant's use of Foglight on AIX

2 | servers, and (2) whether Plaintiff knew how many of Defendant's servers were running Foglight.

3 | In any event, Plaintiff continued to provide support services to Defendant after Foglight was

4 | installed on its AIX servers.  (UF1 ¶¶ 17-23.)

5 |       In June 2007, Plaintiff requested information from Defendant concerning its computer

6 | systems.  At Defendant's direction, HP created data reports (the "June 2007 Reports") and sent

7 | them to Plaintiff.  The June 2007 Reports purported to show the number and type of servers

8 | running Foglight software.  (UF1 ¶¶ 32-33.)  Although the parties dispute the accuracy of the

9 | June 2007 Reports, there is no dispute Plaintiff could not have been ignorant of Defendant's

10 | overdeployment after receiving them.  (Plaintiff's Opposition to Defendant's First Motion

11 | ("Opp'n") at 4:7-8.)

12 |       In late 2008, Plaintiff sent Defendant an invoice that included (1) true-up fees for the

13 | overdeployed licenses; (2) "retroactive" maintenance fees for the overdeployed licenses; and (3)

14 | maintenance fees for 2009.  (Second Motion at 3:21:25.)  Defendant refused to pay the invoice

15 | and Plaintiff filed suit.

16 |       Based on these facts and others, Plaintiff asserts claims against Defendant for copyright

17 | infringement and breach of contract.  Defendant now files two Motions for Partial Summary

18 | Judgment – one on Plaintiff's claims for copyright infringement and breach of contract and the

19 | other concerning damages.

20 |

21 | **PRELIMINARY MATTERS**

22 |

23 |       The parties submitted numerous evidentiary objections.  In motions with numerous

24 | objections, "it is often unnecessary and impractical for a court to methodically scrutinize each

25 | objection and give a full analysis of each argument raised."  *Doe v. Starbucks, Inc.*, No. 08-0582,

26 | 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).

27 |       The Court has reviewed the parties' objections and relies only on admissible evidence.

28 | *See F.T.C. v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1118 n.5 (S.D. Cal. 2008) ("The parties have

1  each filed evidentiary objections.  However, in deciding the present motions, the Court has only

2  relied upon admissible evidence."); *See also Schroeder v. San Diego Unified School Dist.*, Case

3  No. 07-266, 2009 WL 1357414, at *2, n.1 (S.D. Cal. May 13, 2009).

4

5  **LEGAL STANDARD**

6

7       Summary judgment is appropriate only where the record, read in the light most favorable

8  to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . .

9  the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex*

10  *Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Material facts are those necessary to the proof or

11  defense of a claim, as determined by reference to substantive law.  *Anderson v. Liberty Lobby,*

12  *Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is genuine "if the evidence is such that a

13  reasonable jury could return a verdict for the nonmoving party."  *Id*.  In deciding a motion for

14  summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable

15  inferences are to be drawn in his favor."  *Id*. at 255.

16       The burden initially is on the moving party to demonstrate an absence of a genuine issue

17  of material fact.  *Celotex*, 477 U.S. at 323.  If, and only if, the moving party meets its burden,

18  then the nonmoving party must produce enough evidence to rebut the moving party's claim and

19  create a genuine issue of material fact.  *Id.* at 322-23.  If the nonmoving party meets this burden,

20  then the motion will be denied.  *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099,

21  1103 (9th Cir. 2000).

22

23  **ANALYSIS**

24

25       The Court first considers Defendant's Motion for Partial Summary Judgment on

26  Plaintiff's claims for copyright infringement and breach of contract.  The Court then considers

27  Defendant's Motion for Partial Summary Judgment on maintenance fees damages.

28

**1.      PLAINTIFF'S FIRST CLAIM, FOR COPYRIGHT INFRINGEMENT**

Plaintiff alleges that Defendant infringed its registered Foglight copyrights, in violation of the Copyright Act, 17 U.S.C. Section 101 *et seq.* (Compl. ¶ 28.)   Plaintiff bases this claim on two theories:  (1) that Defendant improperly used Foglight software on CPUs with AIX servers, and (2) that Defendant used Foglight on more CPUs than the License Agreement permitted  (*Id.* ¶¶ 16, 20, 27.)  Plaintiff also claims that Defendant infringed its copyrights by altering the Foglight software.  (Opposition to Defendant's First Motion ("Opp'n") at 9:8-10:27.)  The Court considers these arguments in turn.

**1.1      Use of Foglight Software on AIX Servers**

In its Complaint, Plaintiff alleges that Defendant violated its Foglight copyrights by copying Foglight onto AIX servers without Plaintiff's authorization.  (Compl. ¶ 31.)  Defendant argues that using Foglight on its AIX servers did not violate Plaintiff's copyrights because Plaintiff impliedly licensed Defendant to do so.  (UF1 ¶ 15.)  The Court agrees with Defendant.

"The existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).  A nonexclusive license, like the one in this case, may be granted expressly or impliedly through conduct.  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990).  An implied license may be found where conduct by the copyright holder leads another party to believe that they may use the copyright.  *See Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (citing *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927)).

An implied license to use copyrighted software exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute [the] work" or "use, retain and modify the programs." *Asset*

1  *Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (footnote and internal

2  quotation marks omitted).

3        Here, the first requirement is satisfied because Defendant paid Plaintiff to adapt Foglight

4  to AIX servers supporting Defendant's call centers.  (UF1 ¶¶ 17-20, 24-26, 37.)  The second

5  requirement is also met because Plaintiff delivered Foglight to Defendant and uploaded it to the

6  AIX servers.  (*Id.* ¶ 23.)  And the third requirement is satisfied because Plaintiff permitted

7  Defendant to use Foglight on AIX servers.  The March 2007 Statement of Work signed by the

8  parties provided that Defendant would "[d]eploy Foglight . . . on as many AIX servers as

9  possible . . . "  (*Id.* ¶ 25.)  The efforts of Plaintiff's consultants to load Foglight on the AIX

10  servers further demonstrate that Plaintiff not only knew of Defendant's use Foglight on the AIX

11  servers, but intended Defendant to use Foglight in this manner.  (*Id.* ¶ 26.)

12

13        **1.2      Overdeployment of Foglight Software**

14

15        Plaintiff also argues that Defendant violated its Foglight copyrights by running Foglight

16  software on more CPUs than the License Agreement allowed.  This argument fails because it

17  states a claim for contract breach, not for copyright infringement.

18        "Generally, a copyright owner who grants a nonexclusive license to use his copyrighted

19  material waives his right to sue the licensee for copyright infringement and can sue only for

20  breach of contract."  *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999)

21  (internal quotation marks omitted).  A licensee may sue for copyright infringement only when

22  the licensee acts outside the scope of the license.  *Id.* (citing *S.O.S., Inc. v. Payday, Inc.*, 886

23  F.2d at 1081, 1087 (9th Cir. 1989).

24        To prove that a licensee acted outside the scope of a license, the licensor "must

25  demonstrate that the violated term . . . is a condition rather than a covenant" under state contract

26  law and federal copyright law.  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 2011 U.S. App.

27  LEXIS 3428, at *15 (9th Cir. Feb 14. 2011).  Stated somewhat circularly, conditions are

28  "contractual terms that limit a license's scope . . . the breach of which constitute[s] copyright

6

1  infringement." *Id.* at \*16.  All other license terms are "covenants," which the Ninth Circuit has

2  defined to mean a "contractual promise, i.e., a manifestation or intention to act or refrain from

3  acting in a particular way." *Id*. (citing Restatement (Second) of Contracts § 2 (1981)).

4  Here, the overdeployment and true-up provisions in the License Agreement permit

5  Defendant to use Foglight on additional CPUs for an extra fee.  These provisions are properly

6  described as covenants because they do not concern the scope of the license, only the number of

7  CPUs the license covers.  *See, e.g., BroadVision, Inc. v. Medical Protective Co.*, 2010 U.S. Dist.

8  LEXIS 131106 (S.D.N.Y. Nov. 23, 2010) (applying California law to find that the license

9  provisions permitting excess use of software in exchange for higher fees are covenants, not

10  conditions.)  Because the provision restricting the number of CPUs on which Foglight can run is

11  a covenant, its breach provides Plaintiff no grounds to claim that Defendant infringed its

12  copyright.

13

14      **1.3      Alteration of Foglight Software**

15

16  In its Opposition, Plaintiff argues for the first time that Defendant infringed its Foglight

17  copyrights by altering the Foglight software.  (Opp'n at 9:11-27.)  Plaintiff contends that its

18  copyright claims must survive Defendant's First Motion because "questions remain as to

19  whether DirecTV itself made changes to the Foglight software beyond those authorized and

20  performed by Quest . . . ."  (UF1 ¶¶ 20, 54, 55.)  Plaintiff also states that questions of fact exist

21  as to whether the customization work performed by HP, Defendant's agent, constituted

22  copyright infringement.  (Opp'n to First Motion at 9:27-10:1.)

23  Plaintiff's argument fails because it is factually unsupported and procedurally improper.

24  To support its contention that Defendant impermissibly altered the Foglight software, Plaintiff

25  cites several lines of deposition testimony from Defendant's employee who used to work for HP

26  and three paragraphs from Defendant's Statement of Uncontroverted Facts and Law.  (*Id.* at

27  9:25-27.)  First, Defendant's employee's testimony does nothing to establish that Defendant or

28  HP altered the Foglight software.  (Declaration of William J. Kolegraff in Support of

7

1   Defendant's Reply to Plaintiff's Opp'n at Ex A.; UF1 ¶¶ 20, 54, 55.)  It only suggests that HP

2   was *capable* of making such changes.  (*Id.*)

3        Likewise, Plaintiff's references to Defendant's uncontroverted facts prove nothing.

4   Those facts establish that Plaintiff's consultant "traveled to HP's facilities multiple times . . . to

5   install and customize the Foglight software on DIRECTV's AIX servers . . . " (UF1 ¶ 20.)  But

6   this demonstrates that Plaintiff's agent, not Defendant, modified the Foglight software.  Other

7   undisputed facts indicate that Plaintiff helped Defendant install, troubleshoot, and customize

8   Foglight.  (*Id.* ¶¶ 54, 55.)  They provide no support for Plaintiff's claim that Defendant made

9   impermissible modifications to its software.

10       Plaintiff's argument also fails because it is procedurally improper.  Plaintiff did not plead

11  this theory of liability in its Complaint.  Nor did Plaintiff raise this argument in its Rule 26(f)

12  disclosure or at anytime during discovery.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th

13  Cir. 2000) ("[A]dding a new theory of liability at the summary judgment stage would prejudice

14  the defendant who faces different burdens and defenses under a second theory of liability."

15  (citations omitted)).  The Court will not permit Plaintiff to raise this theory of liability for the

16  first time in its Opposition to Defendant's First Motion.

17

18       **1.4     Conclusion**

19

20       There is no genuine issue of material fact concerning Plaintiff's claim for copyright

21  infringement.  Thus, the Court GRANTS  Defendant's First Motion on Plaintiff's first claim.

22

23  **2.      PLAINTIFF'S SECOND CLAIM, FOR BREACH OF CONTRACT**

24

25       Plaintiff alleges that Defendant breached the License Agreements by (1) overdeploying

26  its licenses of Foglight software and (2) using Foglight on the AIX servers.  (Comp. ¶ 41.)

27  Defendant does not move for summary judgment on the basis that it never overdeployed

28  Foglight software.  In its First Motion, Defendant instead argues that equitable estoppel bars

1  Plaintiff from asserting that Defendant breached the License Agreement.  Before turning to the

2  parties' specific claims, the Court first examines the doctrine of equitable estoppel.

3

4  **2.1    Equitable Estoppel**

5

6  Four elements are necessary to establish equitable estoppel:

7          (1) the party to be estopped must know the facts (2) he must intend

8          that his conduct shall be acted on or must so act that the party

9          asserting the estoppel has a right to believe it is so intended; (3) the

10          latter must be ignorant of the true facts; and (4) he must rely on the

11          former's conduct to his injury.

12  *U.S. v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988) (citing *Bob's Big*

13  *Boy Family Restaurants v. N.L.R.B.*, 625 F.2d 850, 854 (9th Cir. 1980)).  In other words, a

14  plaintiff will be estopped from asserting a breach of contract claim if he aids or induces a breach.

15  *See Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006).

16          Here, for its equitable estoppel defense to succeed, Defendant must prove the following:

17  (1) that Plaintiff knew Defendant was using Foglight software on AIX servers or overdeploying

18  Foglight; (2) that Plaintiff's actions or omissions led Defendant to believe that Plaintiff did not

19  intend to enforce its rights under the License Agreement; (3) that Defendant was unaware that

20  Plaintiff objected to its use of Foglight software on AIX servers or its overdeployment of

21  Foglight; and (4) that Defendant detrimentally relied on Plaintiff's actions or omissions.

22          The parties' arguments concerning equitable estoppel resemble two ships passing in the

23  night.  Defendant forcefully argues that equitable estoppel bars Plaintiff from claiming that

24  Defendant beached the License Agreement by *using Foglight on the AIX servers*, but says little

25  about overdeployment.  Plaintiff, on the other hand, largely ignores the AIX servers.  Instead,

26  Plaintiff focuses on arguing that equitable estoppel does not bar its claim that Defendant

27  breached the License Agreement by *overdeploying Foglight software*.

28          The Court now will now bring these ships to safe harbor.

9

1

**2.2     Using Foglight on the AIX Servers**

2

3          To support its equitable estoppel defense, Defendant claims that Quest "helped [it] install

4     Foglight on the AIX servers" and "led [it] to believe it did not object to that use, or require any

5     payment for such use." (First Motion at 13:15-19.)  Defendant also claims that it relied, to its

6     detriment, on Plaintiff's actions when deciding to install Foglight on the AIX servers. *Id.*  Thus,

7     Defendant concludes that equitable estoppel bars Plaintiff breach of contract claim as to

8     Defendant's use of Foglight on AIX servers.  The Court agrees.

9

10         **2.2.1   Whether Plaintiff Knew of Defendant's Use of Foglight Software on**

11                    **AIX Servers**

12

13         To satisfy the first element of the equitable estoppel test, Defendant must prove that

14     Plaintiff knew Defendant was using Foglight software on AIX servers.  The facts demonstrate

15     that Plaintiff helped Defendant "install and customize Foglight on AIX servers." (UF1 ¶ 54.)

16     Plaintiff does not dispute that it was aware that Defendant used Foglight on AIX servers.

17     Accordingly, the Court finds this element to be satisfied.

18

19         **2.2.2   Whether Plaintiff's Actions or Omissions Demonstrated That it Did**

20                    **Not Intend to Enforce its Contract Rights**

21

22         To satisfy the second element, Defendant must prove that Plaintiff led it to believe that

23     Plaintiff would not enforce its contract rights to prevent Defendant from using Foglight on the

24     AIX servers.  Defendant claims that "Quest's actions and lack of objection led DIRECTV

25     reasonably to believe it had permission to use Foglight on the AIX servers . . . ." (First Motion at

26     15:21-23.)  As noted, Plaintiff helped Defendant customize Foglight for AIX servers.  Plaintiff

27     also sent consultants to teach Defendant how to operate Foglight software on AIX servers,

28

1    without ever telling Defendant that it was unlicensed to use Foglight software on AIX servers or

2    demanding license fees for such use.  (*Id.* at 15:27-28.)

3         Plaintiff fails to present adequate proof that its actions did not lead Defendant to believe

4    that it had permission to run Foglight on AIX servers.  The Court finds this element to be

5    satisfied.

6

7         **2.2.3.  Whether Defendant was Ignorant of Plaintiff's Objections**

8

9         To satisfy the third element, Defendant must prove that it was unaware that Plaintiff

10   objected to its use of Foglight on AIX servers.   Defendant claims that it was unaware of

11   Plaintiff's objection for the same reasons identified in Section 2.2.2.  For example, Defendant

12   claims that Plaintiff's actions – "teaching DIRECTV how to install Foglight on the machines"

13   and "working with DIRECTV to overcome problems" – led Defendant to believe that Plaintiff

14   had no objection to its use of Foglight on AIX servers.  (First Motion at 16:20-23.)

15        As before, Plaintiff provides insufficient evidence to support a claim that Defendant was

16   aware that it objected to Defendant's use of Foglight software on AIX servers.  The Court finds

17   this element to be satisfied.

18

19        **2.2.4.  Whether Defendant Relied to Its Detriment**

20

21        To satisfy the fourth element, Defendant must prove that it relied to its detriment on

22   Plaintiff's silence.  Defendant claims that it would not have used Foglight on AIX servers if it

23   had known that Plaintiff would claim fees.  (Motion at 17:14-16.)  The Court finds, and Plaintiff

24   does not effectively dispute, that Defendant has satisfied this element.

25

26

27

28

11

1

2

### 2.2.5.  Conclusion

3      The Court has reviewed Plaintiff's other arguments, and finds them unpersuasive.

4  Defendant has demonstrated that equitable estoppel bars Plaintiff's breach of contract claim as to

5  Defendant's use of Foglight software on AIX servers.  Thus, the Court GRANTS Defendant's

6  Motion for Partial Summary Judgment on Plaintiff's breach of contract claims for the

7  unauthorized use of Foglight on AIX servers.

8

### 2.3      Overdeploying Foglight Software

9

10

11      As noted, Defendant dedicates most of his First Motion to arguments concerning AIX

12  servers, and gives much less attention to the issue of overdeployment.  Because Defendant does

13  not come close to satisfying all four equitable estoppel factors on this issue, Plaintiff's breach of

14  contract claim based on Defendant's alleged overdeployment survives summary judgment.

15

### 2.3.1  Whether Plaintiff Knew of Defendant's Overdeployment of Foglight

16

17

18      Plaintiff argues that it was not aware of Defendant's overdeployment of Foglight until

19  June 2007, when HP provided results of an audit of Defendant's computer systems to Plaintiff.

20  (Opp'n to First Motion at 3:21-4:7.)   Defendant disputes this fact, arguing that Plaintiff knew

21  Defendant was overdeployed before June 2007.  (UF1 ¶ 58.)

22      Defendant presents insufficient evidence to support its claim that Plaintiff was aware of

23  the overdeployment before June 2007.  Defendant claims that in March 2007, Plaintiff created a

24  Statement of Work instructing its agents to "[d]eploy Foglight [software] . . . on as many AIX

25  servers as possible within the allocated amount of time."  (Motion at 15:12-13.)  But Defendant

26  does not explain how this statement proves that Plaintiff knew about the overdeployment.

27  Indeed, this statement means only what it says – that Plaintiff intended to deploy Foglight

28  software on as many of AIX servers as possible in a limited period of time.  It doesn't imply,

1   much less prove, that Defendant intended to install Foglight software on more CPUs than the

2   License Agreement permitted.

3        Defendant also claims that Plaintiff had "estimates" of Defendant's pre-June 2007

4   deployment of Foglight.  (Reply at 10:14-15.)  Defendant claims, for example, that in April

5   2006, it informed Plaintiff of its plans to use Foglight on 192 AIX servers.  (*Id.* at 10:16.)  This

6   argument is flawed.  First, mere estimates do not provide a sufficient basis to establish that

7   Plaintiff's *knew* Defendant was overdelployed.  Second, Defendant does not provide evidence

8   demonstrating that 192 servers constitutes an overdeployment.

9        Defendant further claims that in July 2006 one of Plaintiff's employees attempted to bill

10  Defendant to deploy Foglight on 550 AIX servers.  Even if true, this does not come close to

11  proving that no genuine issue of material fact exists concerning overdeployment.

12       Because Defendant has not proven that Plaintiff was aware of any overdeployment, at

13  least before June 2007, its equitable estoppel defense fails on this point.  When Plaintiff became

14  aware of Defendant's purported overdeployment is a genuine issue of material fact.

15  Accordingly, the Court DENIES Defendant's Motion for Partial Summary Judgment on

16  Plaintiff's claim for breach of contract for overdeployment of Foglight software.

17

18       **2.3.2   Whether Plaintiff's Actions or Omissions Demonstrated That It Did**

19              **Not Intend to Enforce Its Contract Rights**

20

21       Even if Defendant could prove that Plaintiff knew of the overdeployment, its equitable

22  estoppel defense would fail because an issue of fact exists concerning whether Plaintiff intended

23  to enforce its contract rights.  Defendant claims that Plaintiff did not intend to charge Plaintiff

24  for any overdeployment, but the terms of the License Agreement indicate otherwise.

25       The License Agreement specifically addresses the issue of payment in cases of

26  overdeployment.  Under the terms of the License Agreement, Defendant had the "right to

27  increase the aggregate number of CPU's . . . by up to 10% per product . . . at no additional fee."

28

1   (First Motion at 4:1-9.)  Defendant could exceed this 10% threshold on the condition that it paid

2   Plaintiff additional license fees.  (*Id.*)

3        Plaintiff argues that the existence of this true-up provision is one of the reasons why it did

4   not immediately seek overdeployment fees from Defendant.  Whatever the merits of this claim, it

5   raises an issue of fact that the Court cannot decide on summary judgment.

6

7        **2.3.3   Conclusion**

8

9        The Court has considered Defendant's other arguments, and finds them unpersuasive.

10  Because genuine issues of fact exist concerning Plaintiff's knowledge of Defendant's

11  overdeployment and Plaintiff's willingness to enforce its contract rights, the Court need not

12  consider factors three and four of the equitable estoppel test.  Equitable estoppel does not bar

13  Plaintiff from claiming that Defendant's purported overdeployment constituted a breach of the

14  License Agreement. Accordingly, the Court DENIES Defendant's Motion for Partial Summary

15  Judgment on Plaintiff's claim for breach of contract based on overdeployment.

16

17  **3.        PLAINTIFF'S CLAIM FOR MAINTENANCE SERVICE FEE DAMAGES**

18

19       Plaintiff alleges that Defendant breached the License Agreement by failing to pay

20  maintenance service fees.  (Compl. ¶¶ 24-26, 42.)  Defendant argues that the License Agreement

21  doesn't require it to pay the maintenance fees Plaintiff seeks to recover.  The Court first

22  considers Plaintiff's claim for maintenance fee damages for 2009.  It then turns to Plaintiff's

23  claim for "retroactive" maintenance fees.  Finally, the Court discusses the quasi-contract

24  argument Plaintiff raises for the first time in its Opposition to Defendant's Second Motion.

25

26

27

28

1          **3.1      Plaintiff's Claim for Maintenance Fee Damages For 2009**

2

3          Plaintiff alleges that Defendant breached the License Agreement by failing to pay

4    software maintenance fees to Plaintiff for first quarter of 2009.  (Compl. ¶¶ 24-26, 42.)

5    Defendant argues that it was not obligated to pay software maintenance fees in 2009 because it

6    properly canceled the maintenance services agreement.  (Second Motion at 5:8-10.)   The Court

7    agrees with Defendant.

8          As noted, the parties entered into two agreements in 2002.  First, the parties signed a

9    standard form software license agreement.  One week later, the parties negotiated an Addendum,

10   which modified the terms of the standard form.  Together, these agreements constitute the

11   License Agreement.  Section 10 of the License Agreement governs "Maintenance And Other

12   Services."  Under that section, "Maintenance Periods" begin on the date of the first invoice

13   mailed by Plaintiff and end 12 months later.  (*Id.*)  Section 10 also provides that:

14              Each Maintenance Period shall automatically renew for another

15              twelve (12) months unless the renewal has been cancelled by either

16              party's giving written notice at least sixty (60) days prior to that first

17              day of the renewal Maintenance Period.  *Licensee's failure to make*

18              *payment on a maintenance renewal invoice shall constitute*

19              *Licensee's cancellation of Maintenance Services.*

20   (*Id.*) (emphasis added).

21         Although Section 10 is not a model of clarity, its language permits Defendant, as licensee,

22   to cancel maintenance services simply by failing to make payment on a maintenance renewal

23   invoice.  In December 2008, Plaintiff sent an invoice requesting renewal of maintenance services

24   for 2009.  (Second Motion, Ex. F.)  By not paying the bill, Defendant effectively canceled

25   maintenance services.  (UF2 ¶ 8.)

26         Plaintiff admits that the License Agreement modified by the Addendum permitted

27   Defendant to discontinue maintenance services by not paying the renewal invoice.  Plaintiff also

28   admits that Defendant declined to renew the maintenance contract when it expired at the end of

1   2008.  Thus, there is no genuine issue of material fact concerning Defendant's contractual

2   obligation to pay maintenance fees in 2009.

3

4        **3.2     Plaintiff's Claim for Retroactive Maintenance Fees**

5

6        Plaintiff also alleges that Defendant owes "retroactive" maintenance fees on the licenses

7   it overdeployed.  (Compl. ¶¶ 24-26, 42.)  Defendant argues that Plaintiff cannot recover

8   "retroactive" maintenance fees because the true-up provision in the License Agreement never

9   mentions them.  (Second Motion at 5:8-10.)  Again, the Court agrees with Defendant.

10      As noted, overdeployment does not constitute an automatic breach of the License

11  Agreement.  In fact, the License Agreement provides specific procedures to follow in cases of

12  overdeployment.  Under the terms of the License Agreement, a licensee can remedy

13  overdeployment simply by paying the licensor for the extra licenses.  The true-up provision in

14  Paragraph 16 of the License Agreement provides that:

15              If the Licensee's use of the Software is found to be greater than

16              contracted for, Licensee will be invoiced for the additional licenses

17              or license upgrades (based on the applicable units of measure, e.g.,

18              servers, server tiers, or users) and the license fees shall be payable in

19              accordance with this Agreement.

20  (Second Motion, Ex. F.)  Significantly, the true-up provision does not require payment of

21  maintenance fees in cases of overdeployment.

22      Still, Plaintiff claims that the true-up provision requires payment of maintenance fees as

23  well.  For example, Plaintiff states that "even if the overdeployment itself did not constitute a

24  breach of the agreement, DirecTV's subsequent refusal to provide compensation to Quest for the

25  unauthorized licenses *and associated maintenance benefits* enjoyed by those licenses did

26  constitute a breach . . . ."  (Opp'n to Second Motion at 7:22-28 (emphasis added).)   Plaintiff also

27  claims that the true-up mechanism contemplated payment for "unauthorized licenses *and*

28  *maintenance thereon*."  (*Id.* at 4:21-27 (emphasis added).)

16

1   Plaintiff's arguments cannot overcome the plain language of the License Agreement.

2   Defendant is required to pay licenses fees, not maintenance costs, on overdeployed Foglight

3   software.  Because the License Agreement does not require Defendant to pay retroactive

4   maintenance fees when overdeployment occurs, Plaintiff's claim for retroactive maintenance fee

5   damages fails as a matter of law.

6

7   **3.3    Quasi-Contract**

8

9   After arguing the merits of its contract claims for maintenance fee damages, Plaintiff asks

10   the court to consider "quasi-contractual theories of recovery as well."  (Opp'n to Second Motion

11   at 9:1-28.)  Plaintiff did not allege these theories in its Complaint or raise them during discovery.

12   So Plaintiff asks the Court to treat Defendant's Motion as a Rule 12(c) motion for judgment on

13   the pleadings and permit Plaintiff "to amend its complaint to state a claim for restitution based

14   on quantum meruit." (*Id.*)

15   The Court need not address the merits of Plaintiff's quantum meruit argument because its

16   request to amend its pleadings, coming nearly two years after filing suit and less than one month

17   before trial, is untimely.  In its April 2010 Scheduling Order, the Court gave the parties 90 days

18   to amend their pleadings, explaining that post-deadline amendment would be permitted only

19   under "exceptional circumstances."  (Dkt. No. 27.)

20   Federal Rule of Civil Rule 16(b) requires a showing of "good cause" when a party seeks

21   to amend its pleading after the deadline established in a scheduling order.  *Coleman v. Quaker*

22   *Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000.)  If the party seeking the amendment "was not

23   diligent, the inquiry should end."  *Id.*  Here, Plaintiff has not been sufficiently diligent.

24

25

26

27

28

1  **3.4    Conclusion**

2

3      The Court has considered Plaintiff's other arguments, and finds them unpersuasive.

4  Defendant's Motion for Partial Summary Judgment on Plaintiff's claims for damages for unpaid

5  maintenance fees is GRANTED in full.

6

7  **DISPOSITION**

8

9      The Court thoroughly reviewed the parties' papers and issued a Tentative Order.  At the

10  hearing on the Tentative Order, additional arguments were presented.  But there has not been a

11  Rule 56(d) motion and the Court feels impelled to based its Order on the papers submitted.

12      Defendant's First Motion for Partial Summary Judgment is GRANTED as to Plaintiff's

13  claim for copyright infringement.  Defendant's First Motion for Partial Summary Judgment is

14  GRANTED in part and DENIED in part as to Plaintiff's claim for breach of contract.  Equitable

15  estoppel bars Plaintiff from claiming that Defendant breached the License Agreement by using

16  Foglight on the AIX servers.  But equitable estoppel does not bar Plaintiff from claiming that

17  Defendant breached the License Agreement by overdeploying the Foglight software.

18  Defendant's Second Motion for Partial Summary Judgment on Plaintiff's claims seeking

19  recovery for maintenance fee damages is GRANTED in full.

20

21

22

23

   IT IS SO ORDERED.

24

   DATED: September 26, 2011

25

   _____

26                          Andrew J. Guilford
                            United States District Judge

27

28

18